UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRUCE BARLIP<br>364 Fisherman Road<br>Hamburg, PA 19526<br>　　　　　　　　　　Plaintiff<br><br>vs.<br><br>NORFOLK SOUTHERN<br>CORPORATION d/b/a NORFOLK<br>SOUTHERN RAILWAY COMPANY<br>1200 Peachtree Street NE<br>Atlanta, GA 30309<br>　　　　　　　　　　Defendant | CIVIL ACTION<br><br>NO.:<br><br>JURY TRIAL DEMANDED |

## PLAINTIFF'S COMPLAINT

### JURISDICTION

1. The Plaintiff, Bruce Barlip, brings this action against the Defendant, Norfolk Southern Corporation, for violations of the Federal Rail Safety Act, 49 U.S.C. §20109.

2. This court has subject matter jurisdiction in this case pursuant to the Federal Rail Safety Act, 49 U.S.C. §20109(d)(3)(FRSA).

### THE PARTIES

3. The Plaintiff, Bruce Barlip, is a citizen and resident of the Commonwealth of Pennsylvania, residing therein at 364 Fisherman Road, Hamburg, PA 19526.

4. The defendant, Norfolk Southern Corporation d/b/a Norfolk Southern Railway Company is a corporation duly organized and existing under and by virtue of the laws of the State of Virginia, does business in the Eastern District of Pennsylvania, and has a place of business located at 1200 Peachtree Street NE, Atlanta, GA 30309.

5. At all times material hereto, Norfolk Southern operated 2,419 miles of track in Pennsylvania; had 1,589 bridges in Pennsylvania; and had 1,838 grade crossings in Pennsylvania. Furthermore, the defendant operates inbound and outbound trains throughout Pennsylvania carrying numerous types of freight. In addition, the defendant serves the ports of Philadelphia and has facilities in King of Prussia, Pennsylvania and Pottstown, Pennsylvania. As such, the defendant regularly engages in interstate commerce and conducts business within the Commonwealth of Pennsylvania in the Eastern District of Pennsylvania.

6. During all times mentioned herein, the railroad defendant engaged in interstate commerce by providing railroad transportation between several of the states of the United States.

7. At the time of the defendant's FRSA violations, the plaintiff was employed by the defendant railroad.

8. The plaintiff is a qualified employee within the meaning of 49 U.S.C. §20109.

## FACTS

9. On or about October 21, 2021, plaintiff was employed by the defendant and was working at defendant's Reading, Pennsylvania yard in the capacity of a conductor.

10. On October 21, 2021, the defendant's Reading yard was visited by FRA investigator Jared Cabe and Pennsylvania PUC investigator Lugene Bastin.

11. Both the FRA and the PUC investigators spoke with the plaintiff and asked plaintiff both specific and general questions concerning safety at the Reading yard, documentation completed by managers at the Reading yard, and compliance by the defendant with various federal and state safety rules and regulations.

12. In response to those inquiries, plaintiff provided full and complete responses to the FRA and PUC investigators regarding several safety concerns at the Reading yard, perceived

violations of federal and state regulations, and improper conduct by NS managers including but not limited to track switches being in disrepair, track conditions causing excess rocking of cars and frogs missing bolts, and train cars and consists that included extra cars on the train.

13. As a result of their interview with the plaintiff, as well as their independent investigation, both the FRA and PUC investigators found significant regulatory breaches that it required defendant's Reading yard managers, particularly Trainmaster Havier Herrera, to correct.

14. Mr. Herrera had known that the plaintiff had spoken to the FRA and the PUC investigators, had informed them of unsafe conditions and regulatory breaches, and that he was partially responsible for the admonitions given to him by the FRA and PUC investigators, the embarrassment that Mr. Herrera suffered because of those admonitions, and the additional time it took Mr. Herrera to make the corrections mandated by the FRA and PUC investigators.

15. As a result of engaging in the protected activity of speaking with FRA and PUC investigators, answering their questions honestly, and reporting unsafe conditions and regulatory breaches, NS, particularly Mr. Herrera, engaged in ongoing, consistent, and repeated harassment that continues to this day.

16. On October 25, 2021, just four days after engaging in his protected activity, plaintiff was ordered by Trainmaster Herrera to take loaded sand cars from Reading to Dyers and to pick up a FRA dead locomotive, take the train to Annville to drop off the sand cars and pick up another FRA dead locomotive and 60 loaded stone cars to deliver to Enola, Pennsylvania. Due to insufficient time, plaintiff and the engineer spoke to the dispatcher and reported that they would not have enough time to reach Enola by the end of their tour. The dispatcher instructed the plaintiff and the crew to cut away the light power and leave the FRA dead engines and the train behind and return to the yard in Reading, Pennsylvania.

17. On October 26, 2021, the plaintiff was told not to come into work due to an alleged lack of manpower. Trainmaster Herrera asked the plaintiff why he had not brought the FRA dead engine back to the original location. Trainmaster Herrera further stated that he had instructed the dispatcher to have the plaintiff and his crew bring back the FRA dead engines which was not the instructions that the dispatcher relayed to the plaintiff's crew. Trainmaster Herrera then told the plaintiff that he was being disciplined because he had not brought the engines back to Reading the day before even though he was specifically instructed by the NS dispatcher not to do so.

18. On October 26, 2021, despite having broken no rules and having engaged in no improper conduct, Trainmaster Herrera threatened the plaintiff with discipline.

19. On October 27, 2021, Trainmaster Herrera threatened the plaintiff with discipline and falsely accused him of not using a radio during the 3-step protection process to remove and replace a marker. The threat was made despite the fact that plaintiff had complied with all company rules and federal regulations with regard to that activity.

20. On November 29, 2021, plaintiff attempted to sign up for an open assignment but Trainmaster Herrera arbitrarily, capriciously, and in violation of company rules and the collective bargaining agreement, refused to allow the plaintiff to bid on that job. Even after Trainmaster Herrera was informed that his actions were in violation of the collective bargaining agreement between the union and the defendant. In addition, the plaintiff was able to hold the job because the plaintiff was able to exercise his seniority to hold this particular job which he had worked on prior occasions with no problems. Mr. Herrera continued to deny the plaintiff the opportunity to work on the open assignment and earn income from that assignment.

21. On December 2, 2021, and prior thereto, Trainmaster Herrera had arbitrarily, capriciously, and for purely retaliatory reasons had denied the plaintiff certain leave that was requested

for a funeral, a medical emergency for his son and for other reasons that NS routinely granted other employees. Plaintiff was denied the necessary leave and was reprimanded by Trainmaster Herrera and was again threatened by him.

22. On February 5, 2022, both Trainmaster Herrera and Trainmaster George Coffee arbitrarily, capriciously, and for purely retaliatory reasons prevented the plaintiff in that they blocked him from working two temporary job assignments in violation of his seniority and of the collective bargaining agreement between plaintiff's union and the defendant.

23. On February 5, 2022, plaintiff reported the capricious, arbitrary, and retaliatory refusal to permit plaintiff to work two temporary jobs to the Crew Call Desk. In addition, the behavior was reported to various assistant division superintendents. However, the capricious, arbitrary, and retaliatory conduct was not reversed.

24. Throughout the months of February and March, 2022, where other employees were regularly permitted to leave work after 8 hours, plaintiff was arbitrarily, capriciously, and for retaliatory purposes required to work 12 hours.

25. On March 25, 2022, Trainmaster Coffee threatened the plaintiff with disciplinary action for allegedly dropping a railcar on top of skates and leaving the cars with one handbrake, even though the plaintiff performed his job properly and did not violate any company rules or federal regulations.

26. On May 6, 2022, the plaintiff had returned to Reading Yard and Trainmaster Herrera confronted plaintiff once again accusing plaintiff of putting a rock under the D Rail at the Eastern Berks Gateway interchange. He stated that if could prove it was the plaintiff that he would have to reprimand him for it. Plaintiff told him that the D Rail had been reported as defective since

March 23, 2022 and denied putting a rock under the derail. When plaintiff left the area the D Rail was lined and locked in the normal position.

27. On June 1, 2022, the Federal Railroad Administration investigators were again at the defendant's Reading, Pennsylvania facility inspecting locomotives.

28. Several of the locomotives had been shopped and were subject to the FRA inspection.

29. No crews were able to work while the FRA was inspecting the locomotives and the crews, including the plaintiff, were simply waiting for their assignments in the Crew Room.

30. Demonstrating the defendant's retaliatory mindset, Mr. Steve Costello, an ex-road foreman, told all of the employees located in the Crew Room that when he finds out which employee contacted the FRA, "they will pay".

31. On June 1, 2022, plaintiff and his coworkers were assigned to a train involved in a local shifting operation. This means the railcars were brought to and/or from local industries serviced by NS.

32. Mr. Costello, who was located on the train, voiced his concern that the train was not going to have enough power from the locomotive from which the engineer was operating to properly move the entire train from Dyers Quarry back to Reading. The absence of sufficient power would cause the locomotive to stall and disable the entire train.

33. Throughout his career, plaintiff had experienced this situation several times. He was taught by more experienced railroaders, including Trainmaster Herrera (when he was a conductor), that the conductor could and should enter the other locomotive (the one in which the engineer was not located), slightly use an increased throttle on that other unit, and provide just enough

additional power for the train to be able to properly move its load and complete its trip without stalling. This procedure was common on the defendant's railroad, at least in the Reading area.

34. When the train movement was completed, plaintiff was called by Mr. Herrera into his office and told to write a statement about the last move, including plaintiff's assistance in moving the throttle per the NS practice and as previously instructed by Mr. Herrera.

35. Because of the long history of Mr. Herrera retaliating against the plaintiff, plaintiff asked to speak to his Union representative before writing the statement. At no time did the plaintiff refuse to complete a statement.

36. Mr. Herrera became incensed at plaintiff's request, told him that he was being insubordinate, and removed him from service.

37. Plaintiff was removed from service for alleged insubordination even though he never refused to complete the statement, but merely asked to consult with his Union representative first.

38. On June 8, 2022, Mr. Herrera issued disciplinary charges against the plaintiff.

39. Plaintiff was charged with insubordination and operating a locomotive without being an engineer certified to do so.

40. Subsequent to being charged, a disciplinary hearing was held and although plaintiff was not found guilty of insubordination, he was found guilty of operating the locomotive without a proper license and was terminated from the railroad.

41. In October or November, 2022, as a result of the negotiations between plaintiff's Union and the defendant, the termination was rescinded and the plaintiff was permitted to return to his NS employment. However, plaintiff was not paid for the period during which he had been terminated.

42. Since returning to work, based on the agreement between the plaintiff, his Union, and the defendant, plaintiff has continued to be subjected to harassment by Mr. Herrera and others on a continuous basis.

43. The defendant, through its agents, servants, workmen and/or employees, continues to permit plaintiff from bidding on jobs for which he is both qualified and has sufficient seniority, continues to deny plaintiff's request for leave, and continues to engage in other capricious, arbitrary, and abusive behavior for the sole purpose of retaliating against the plaintiff for his protected activities.

44. The aforementioned retaliatory conduct was caused by defendant and its various supervisory employees, agents, workmen and/or employees, who intentionally violated the FRSA.

## **EXHAUSTION ADMINISTRATIVE REMEDIES**

45. On March 15, 2022, the plaintiff filed a FRSA Complaint with the Secretary of Labor's Region II OSHA Whistleblower Office. This was filed within 180 days from the date the plaintiff became aware of the defendant's intent to take adverse or unfavorable personnel action against him.

46. The Secretary of Labor has not issued a final decision in this matter.

47. All of the conduct set forth above demonstrates that the defendant railroad acted with reckless disregard for the law and with complete indifference of plaintiff's rights under the FRSA.

48. Plaintiff has exhausted all administrative remedies that are required by statute and/or common law.

49. Pursuant to 49 U.S.C. §20109(d)(3) of the FRSA, the plaintiff has a statutory right to bring an original action in the United States District Court for the Eastern District of

Pennsylvania, which court has jurisdiction over this FRSA action without regard to the amount in controversy or the citizenship of the parties.

WHEREFORE, in order to encourage employees to freely report all injuries without fear of any retaliation, and further to encourage all employees to freely report unsafe conditions and violations of federal statutes and regulations, thereby ensuring the Federal Railroad Administration has the necessary information to develop and administer an effective rail safety regulatory program that promotes safety in every area in our nation's railroad operations, the plaintiff demands a judgment under the FRSA against the defendant, for all relief necessary to make him whole, including but not limited to:

a. Payment of lost wages and fringe benefits necessary to make the plaintiff whole;
b. Compensatory damages for mental anguish and emotional distress due to the defendant's conduct;
c. Compensatory damages for economic losses due to the defendant's conduct;
d. The statutory maximum of punitive damages; and
e. Special damages for all litigation costs including expert witness' fees and attorneys' fees.
f. Such other relief as the Court deems appropriate under the Federal Rail Safety Act.

**COFFEY KAYE MYERS & OLLEY**

By: _____
**COFFEY KAYE MYERS & OLLEY**
Robert E. Myers, Esquire
*Attorney for Plaintiff*
Suite 718, Two Bala Plaza
Bala Cynwyd, PA 19004
(610) 668-9800 – phone
(610) 667-3352 – fax